IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
DOCKET NO. 3:15-cv-00163-FDW-DCK

| | | |
|---|---|---|
| LEGACY DATA ACCESS, INC., a Georgia corporation, and DIANNE M. PETERS, a Georgia resident, | ) ) ) ) | |
| Plaintiffs, | ) ) | ORDER |
| v. | ) ) | |
| CADRILLION, LLC, a North Carolina limited liability company, LEGACY DATA ACCESS, LLC, a North Carolina limited liability company, and JAMES YUHAS, a North Carolina resident, | ) ) ) ) ) ) | |
| Defendants. | ) ) | |

THIS MATTER is before the Court upon the filing of several post-trial motions. Plaintiffs have filed a Motion for Attorneys' Fees (Doc. No. 87) and Post-Trial Motions (Doc. No. 94). Defendants Cadrillion, LLC and James Yuhas (collectively "Defendants") have filed a Renewed Motion for Judgment as a Matter of Law (Doc. No. 90) and a Motion to Amend the Judgment or, in the Alternative, Motion for New Trial (Doc. No. 92). All parties have responded to all of the pending motions, and they are ripe. The Court finds that a hearing is not necessary to resolve the issues and will address each motion in turn but not necessarily in the order in which the parties filed them.

## I.     BACKGROUND

In the interests of judicial economy, the Court declines to provide a thorough recitation of the testimony, evidence, and arguments presented at the two-week trial before a jury in this matter.

In sum, the causes of action centered around an Asset Purchase Agreement ("APA") signed by Dianne Peters and Legacy Data Access, Inc. ("LDA-GA") (collectively, "Plaintiffs") and Defendant Cadrillion, whereby Plaintiffs sold, transferred, and assigned certain assets to Cadrillion. The APA provided Cadrillion with a "Call Option," or "the right, but not the obligation, to exercise [the] option to purchase from [LDA-GA] or [LDA-GA's] permitted assignee the rights to the Deferred Purchase Price at the Call Price . . . ." (Doc. No. 17, Exh. A, p. 3). The gravamen of the claims concern whether Cadrillion exercised its Call Option and subsequently failed to deliver the Call Price. Upon request by and consent of the parties, the Court bifurcated the compensatory and punitive damages phases of trial.

The first phase of the trial involved Plaintiffs' claims against Cadrillion for breach of contract and against all Defendants for conversion, abuse of process, and unfair and deceptive trade practices. After Plaintiffs rested their case-in-chief, the Court granted Defendants' Rule 50(a) motions for judgment as a matter of law concerning Plaintiffs' claims against Defendant Legacy Data Access, LLC (LDA-NC) under an *alter ego* theory, as well as Plaintiffs' abuse of process claim against Defendants. At the close of all evidence, the Court denied the parties' respective Rule 50(a) motions and submitted Plaintiffs' breach of contract, conversion, and Chapter 75 claims to the jury.

The jury returned verdicts finding: (1) Cadrillion liable for breach of contract in the amount of $256,500; (2) Defendants liable for conversion of the Call Price in the amount of $1,499,999; (3) Defendants committed conduct delineated in the special interrogatories 3(a) through 3(d) of the Verdict Form; (4) Defendants' conduct was not in or affecting commerce; (5) Defendants' conduct was a proximate cause of Plaintiffs' injury; and (6) no damages are awardable for such conduct.

The second phase of the trial involved a determination of punitive damages based on the jury's award for conversion. The jury returned verdicts finding Defendants not liable to LDA-GA for punitive damages but awarding Ms. Peters $3 million in punitive damages: $2 million against Cadrillion and $1 million against Mr. Yuhas.

## II.    ANALYSIS

The jury returned its verdicts on May 13, 2016, and October 4, 2016, and the Clerk entered judgment on October 4, 2016. The parties timely filed several post-trial motions. The Court addresses these motions not in the order in which they were filed but in what the Court deems to be the most logical progression. Discussion of other background information and evidence is set forth below more fully as needed to explain the Court's decision as to each motion.

### A.  Standards of Review

#### 1.  Motion for Judgment as a Matter of Law

Pursuant to Rule 50 of the Federal Rules of Civil Procedure, a party that moved for judgment as a matter of law ("JMOL") at trial may, within twenty-eight days of the entry of judgment, renew the request for JMOL. In ruling on a renewed motion for JMOL, a court may: (1) allow judgment on the verdict; (2) order a new trial; or (3) direct entry of JMOL on the claims. Fed R. Civ. P. 50(b)(1)-(3). A "Rule 50(b) motion should be granted if a district court determines, without weighing the evidence or considering the credibility of the witnesses, that substantial evidence does not support the jury's findings." Konkel v. Bob Evans Farms, Inc., 165 F.3d 275, 279 (4th Cir. 1999) (citing White v. Cnty. of Newberry, 985 F.2d 168, 172 (4th Cir. 1993)). A district court may grant JMOL "if there is no legally sufficient evidentiary basis for a reasonable jury to find for the [non-moving] party . . . ." Cline v. Wal–Mart Stores, Inc., 144 F.3d 294, 301 (4th Cir. 1998) (quoting Abasiekong v. City of Shelby, 744 F.2d 1055, 1059 (4th Cir. 1984)). A renewed motion for JMOL is properly granted "if the nonmoving party failed to make a showing

on an essential element of his case with respect to which he had the burden of proof." Wheatley v. Wicomico Cnty., Md., 390 F.3d 328, 332 (4th Cir. 2004) (citing Singer v. Dungan, 45 F.3d 823, 827 (4th Cir. 1995)).

### 2. Motion for a New Trial or Motion to Alter or Amend the Judgment

Rule 59 of the Federal Rules of Civil Procedure provides an avenue for litigants to seek a new trial under Rule 59(a) or to alter, amend, or vacate a prior judgment under Rule 59(e). Rule 59(a) provides that courts may grant a new trial after a jury trial "for any reason for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1). Under this standard, "[a] new trial will be granted if (1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice, even though there may be substantial evidence which would prevent the direction of a verdict." Cline, 144 F.3d at 301 (citation and internal quotation marks omitted). In making this determination, courts may "weigh the evidence and consider the credibility of witnesses." Id. (citation omitted).

A Rule 59(e) motion "may only be granted in three situations: '(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice.'" Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc., 674 F.3d 369, 378 (4th Cir. 2012) (quoting Zinkand v. Brown, 478 F.3d 634, 637 (4th Cir. 2007)). A Rule 59(e) motion "may not be used to relitigate old matters, or to raise arguments or present evidence that could have been raised prior to entry of judgment." Pac. Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998) (citation omitted). Furthermore, "it is an extraordinary remedy that should be applied sparingly." Mayfield, 674 F.3d at 378 (citing EEOC v. Lockheed Martin Corp., 116 F.3d 110, 112 (4th Cir. 1997)).

4

**B. Defendants' Renewed Motion for JMOL (Doc. No. 90)**

Pursuant to Rule 50(b) of the Federal Rules of Civil Procedure, Defendants contend they are entitled to JMOL, arguing that (1) there is no legal or factual basis to support the conversion award in its entirety, and in the alternative, (2) Ms. Peters cannot assert the conversion claim in her individual capacity, (3) there is no legal or factual basis to support the award of punitive damages, and (4) there is no legal or factual basis to find Mr. Yuhas individually liable.

**1. The Conversion Claim as to All Defendants**

Defendants argue, as they have on multiple occasions throughout this case, that Plaintiffs' conversion claim fails as a matter of law because it is based solely on Defendants' breach of contract.

The economic loss rule provides that "[o]rdinarily, a breach of contract does not give rise to a tort action by the promisee against the promisor." N.C. State Ports Auth. v. Lloyd A. Fry Roofing Co., 294 N.C. 73, 81 (1978), rejected in part on other grounds by Trs. Of Rowan Tech. Coll. v. J. Hyatt Hammond Assocs., Inc., 313 N.C. 230 (1985); see also Cole v. Wells Fargo Bank, N.A., No. 1:15-CV-00039-MR, 2016 WL 737943, at *6 (W.D.N.C. Feb. 23, 2016) ("North Carolina has recognized an 'independent tort' arising out of breach of contract only in 'carefully circumscribed' circumstances.") (citations omitted)). "Tortious conduct must be 'identifiable' and 'distinct from the primary breach of contract claim,' and must be accompanied by sufficient aggravating circumstances." ACS Partners, LLC v. Americon Grp., Inc., No. 3:09CV464-RJC-DSC, 2010 WL 883663 (W.D.N.C. Mar. 5, 2010). "The mere failure to carry out a promise in contract" is insufficient. Strum v. Exxon Co., U.S.A., a Div. of Exxon Corp., 15 F.3d 327, 331 (4th Cir. 1994); Broussard v. Meineke Disc. Muffler Shops, Inc., 155 F.3d 331, 346 (4th Cir. 1998) ("Something more [than the mere failure to carry out a promise in contract] is required."). "The policy behind the independent tort exception is to keep open-ended tort damages from distorting

contractual relations in light of the fundamental difference between tort and contract claims." ACS

Partners, LLC, 2010 WL 883663, at * 7 (citations and quotation marks omitted).

Here, Plaintiffs produced evidence at trial showing that Defendants did more than simply

fail to perform under the contract. After Cadrillion breached the contract by exercising the Call

Option and failing to pay the Call Price, Defendants filed an action against Plaintiffs in which they

sought to deposit $460,406 with this Court pending adjudication of that action. In doing so,

Defendants not only admitted that the $460,406 belonged to Plaintiffs, see Variety Wholesalers,

Inc. v. Salem Logistics Traffic Servs., LLC, 723 S.E.2d 744, 750-51 (N.C. 2012) (requiring

plaintiff to establish retention of ownership of funds to establish conversion), but they refused to

tender that amount to Plaintiffs, thereby depriving Plaintiffs of funds in which they had a vested

interest. Defendants essentially sought to force Plaintiffs into litigation to receive funds that

belonged to them in addition to litigation over what Plaintiffs believed was the correct amount due

under the APA. Evidence showed, and the jury specifically found, that Defendants acted in bad

faith. Thus, although the breach of contract and conversion claims may arise out of the same

nucleus of facts, the tortious conduct is identifiable and distinct from the primary breach of

contract. The fact that the jury awarded Plaintiffs different amounts for each claim supports the

Court's finding.[1]

---

[1] Defendants conduct falls under an exception to the economic loss rule in which North Carolina recognizes a tort claim when the injury is "a conversion of the property of the promisee, which was the subject of the contract, by the promisor." N.C. State Ports Auth., 240 S.E.2d at 82. Although the two examples cited by N.C. State Ports Authority that fall under this exception involve bailor-bailee relationships, neither party has cited any authority suggesting that the exception is limited only to bailor-bailee relationships. Indeed, as Plaintiffs point out, federal courts applying North Carolina law have applied the exception outside of the bailor-bailee context. See McManus v. GMRI, Inc., No. 3:12-CV-009-DCK, 2012 WL 2577420, at *9 (W.D.N.C. July 3, 2012); Makadia v. Cont'l Waste Mgmt., LLC, No. 5:16-CV-00257-F, 2016 WL 6601440, at *2 (E.D.N.C. Nov. 7, 2016); see also Wilkins v. Wachovia Corp., No. 5:10-CV-00249-D, 2011 WL 902031, at *13 (E.D.N.C. Feb. 28, 2011) (noting that the exceptions recognized by N.C. State Ports Authority are nonexclusive). Defendants admitted they owed Plaintiffs at least $460,406, sought to deposit that amount with this Court, and those funds were the subject of the contract.

Defendants contend that the conversion claim also fails because Plaintiffs did not identify the converted money with "evidence of the specific source, specific amount, and specific destination of the funds in question," as required by <u>Variety Wholesalers</u>. That case, however, specifically related to funds transferred electronically, which did not occur here. The general rule instead is that "money may be the subject of an action for conversion *only* when it is capable of being identified and described." <u>Id</u>. at 528 (citation omitted). Here, Plaintiffs sufficiently identified and described the converted funds as the amount Defendants sought to deposit with this Court in order to avoid its obligation to pay under the APA.

Therefore, Plaintiffs established that Defendants deprived Plaintiffs of specifically identifiable funds that admittedly belonged to Plaintiffs. Accordingly, as it has done on multiple occasions throughout this case, the Court rejects Defendants' argument that there is no legal or factual basis to support the conversion claim.

### 2. Ms. Peters's Individual Claim for Conversion

Defendants next argue that even if the conversion claim stands, there is no legal or factual basis to support Ms. Peters's individual claim for conversion because Ms. Peters, in her individual capacity, is not the real party in interest and, therefore, lacks standing to pursue that claim. Defendants, however, failed to raise this argument in their Rule 50(a) Motion for JMOL and, therefore, are precluded from raising it in a Rule 50(b) Renewed Motion for JMOL. <u>See</u> <u>Liberty Mut. Fire Ins. Co. v. JT Walker Indus., Inc.</u>, 554 F. App'x 176, 185 (4th Cir. 2014) ("Rule 50(b) permits a party to renew its Rule 50(a) motion post-trial, asserting the same grounds initially raised in the prior motion.").

### 3. Punitive Damages Award

Defendants next argue that there is no legally sufficient factual basis to support the jury's punitive damages award.

To recover punitive damages, Plaintiffs must produce clear and convincing evidence that could allow a reasonable jury to find that either fraud, malice, or willful and wanton conduct "was present and was related to the injury for which compensatory damages were awarded." N.C. Gen. Stat. § 1D-15(a), (b). "'Malice' means a sense of personal ill will toward the claimant that activated or incited the defendant to perform the act or undertake the conduct that resulted in harm to the claimant." Id. § 1D-5(5). "'Willful or wanton conduct' means the conscious and intentional disregard of and indifference to the rights and safety of others, which the defendant knows or should know is reasonably likely to result in injury, damage, or other harm." Id. §1D-5(7).

Here, the jury awarded punitive damages to Ms. Peters based on its determination that Defendants converted the Call Price. Plaintiffs produced evidence at trial such that a reasonable jury could, and in fact did, find that Cadrillion and Mr. Yuhas acted with ill will toward Ms. Peters or with conscious and intentional disregard of and indifference to her rights. For example, Plaintiffs produced evidence, and the jury specifically found by a preponderance of the evidence, that Cadrillion (1) determined it would never pay any portion of the Call Price unless Plaintiffs agreed to extra conditions not required under the APA or Ms. Peters's employment agreement; (2) calculated the Call Price in bad faith; (3) filed a lawsuit against Plaintiffs in bad faith; and (4) wrongfully asserted its power or position to deprive Plaintiffs of the Call Price. Evidence also showed that Mr. Yuhas committed one or more of these acts. In addition, Plaintiffs presented evidence that Defendants intentionally instructed Scharf Pera to use a formula designed to improperly deflate the value of the Call Price. Accordingly, there is a legally sufficient factual basis to support the jury's decision to award punitive damages. See Mace v. Pyatt, 691 S.E.2d 81, 90 (N.C. App. 2010) (affirming award of punitive damages based on underlying conversion claim where the plaintiff "proved at least one aggravating factor . . . by clear and convincing evidence").

The Court addresses the propriety of the amount of punitive damages below.

### 4. Mr. Yuhas's Liability

Finally, Defendants contend that there is no legal or factual basis to support the conversion and punitive damages award against Mr. Yuhas individually because Cadrillion was the only party obligated under the APA to pay the Call Price. Defendants' argument ignores well-established law "that an individual member of a limited liability company or an officer of a corporation may be individually liable for his or her own torts, including negligence." White v. Collins Bldg., Inc., 704 S.E.2d 307, 310 (N.C. App. 2011); Esteel Co. v. Goodman, 348 S.E.2d 153, 157 (N.C. App. 1986) ("[A]n officer of a corporation who commits a tort is individually liable for that tort, even though the officer may have acted on behalf of the corporation in committing the wrongful act."). Because a reasonable jury could, and did, find that Mr. Yuhas personally committed or participated in wrongful actions, there is a sufficient legal and factual basis to support the conversion and punitive damages award against him. Accordingly, Defendant's Renewed Motion for Judgment as a Matter of Law is DENIED in its entirety.

### C. Defendants' Motion to Amend the Judgment or, in the Alternative, Motion for New Trial (Doc. No. 92)

In the alternative to their Renewed Motion for JMOL, pursuant to Rule 59(e), Defendants move the Court to amend the judgment by: (1) reducing the conversion award to $460,406; (2) reducing the punitive damages award to not exceed the statutory maximum; and (3) eliminating any double counting between the conversion and breach of contract claims. In the alternative, Defendants move for a new trial pursuant to Rule 59(a).

### 1. Reduction of the Conversion Award

The record does not support an award for conversion greater than $460,406. Throughout this case, Plaintiffs have argued that the conversion claim is based on the $460,406 that Defendants

knew it owed to Plaintiffs but instead deposited with the Court. For example, in successfully avoiding JMOL at the conclusion of evidence during the first phase of trial, Plaintiffs' counsel stated: "Here's our theory on the conversion claim . . . . They have a cashier's check they made payable for 460,406. . . . And we believe that was converted. That they knew that was owed. They deposited. They attempted to deposit it with the Court in order to avoid giving it to us." (Rough Trial Trans., May 11, 2016, pp. 172-73).[2] Likewise, in his closing arguments to the jury, Plaintiffs' counsel asked the jury to award Plaintiffs $460,406 for conversion of the money deposited with the Court, stating specifically: "And with regard to that conversion claim, it's 460,000," (Rough Trial Trans., May 13, 2016, p. 93), and "There's been a conversion of the $460,000; 460,406 to be exact," (Id. p. 105:22-23). Indeed, although the parties presented evidence of different amounts for the Call Price, there is no basis in the record to support an award for conversion greater than $460,406. Permitting a greater award would constitute a clear error of law or manifest injustice.

As further support for reducing the conversion award, the Court finds persuasive the First Circuit's decision in Uncle Henry's Inc. v. Plaut Consulting Co., 399 F.3d 33, 49 (1st Cir. 2005). In that case, the trial court reduced a jury's award of damages for negligent misrepresentation from $202,000 to $77,382.99 because, during the jury charge conference and closing arguments, the plaintiff's counsel repeatedly stated that damages for negligent misrepresentation were limited to $77,382.99. Id. at 48-49. In affirming the trial court's decision, the First Circuit explained:

> the district court was justified in concluding that [the plaintiff] stipulated to damages in the amount of $77,382.99 . . . , or, phrased differently, waived any damages in excess of $77,382.99 on the claim. [The plaintiff] made an affirmative representation to the court and opposing counsel, and the district court was entitled to hold [the plaintiff] to it.

---

[2] The rough transcript is not yet certified; however, the Court refers to the rough transcript to help explain the Court's ruling. The court reporter has confirmed the accuracy of all portions of the rough transcript cited herein.

Id. at 49.

Here, as in Uncle Henry's, Plaintiffs' counsel represented to the Court and jury that the conversion claim was based on the $460,406 that Defendants deposited with the Court and that the amount of damages for conversion was $460,406. The Court allowed the conversion claim to proceed to the jury on that theory, and the Court is entitled to hold Plaintiffs to it. Accordingly, because Plaintiffs waived any damages in excess of $460,406, and because the record does not support a greater award, the Court will reduce the award for conversion from $1,499,999 to $460,406.

### 2. Punitive Damages

In light of the Court's reduction of damages awarded for conversion, the Court must also reduce the punitive damages award. N.C. Gen. Stat. § 1D-25(b) provides:

> Punitive damages awarded against a defendant shall not exceed three times the amount of compensatory damages or two hundred fifty thousand dollars ($250,000), whichever is greater. If a trier of fact returns a verdict for punitive damages in excess of the maximum amount specified under this subsection, the trial court shall reduce the award and enter judgment for punitive damages in the maximum amount.

The jury awarded Ms. Peters $3 million in punitive damages ($2 million against Cadrillion and $1 million against Mr. Yuhas); however, based on the Court's reduction of the amount of compensatory damages for conversion to $460,406, punitive damages are capped at a total of $1,381,218. See Rhyne v. K-Mart Corp., 594 S.E.2d 1, 20 (N.C. 2004) ("[S]ection 1D-25(b) applies to the individual jury verdict of each plaintiff."); GE Betz, Inc. v. Conrad, 752 S.E.2d 634, 653 (N.C. App. 2013) (holding trial court erred in entering punitive damages of "$864,891 (three times the compensatory damages amount of $288,297.00) against each defendant individually . . . because the trial court as the finder of fact considered factors not as to each plaintiff's cause of action but as to each defendant." (quotations and citation omitted)).

Because the jury apportioned its $3 million award between Defendants such that Cadrillion owed two thirds of the punitive damages and Mr. Yuhas owed one third, the Court will reduce the punitive award proportionally with respect to each Defendant as follows: $920,812 against Cadrillion and $460,406 against Mr. Yuhas. These reduced awards represent two thirds and one third of the $1,381,218 cap, respectively.

### 3. Double Recovery

Defendants next argue that the damages awards for breach of contract and conversion are duplicative such that the maximum amount of compensatory damages Plaintiffs may recover is $460,406. Plaintiffs waived any contrary argument because they admitted at trial that they could not receive double recovery for breach of contract and conversion and that it was the Court's job to "deal with" the issue after the jury returned its verdict. Specifically, Plaintiffs' counsel stated, "So we're not double dipping and saying that we get a contract claim with a conversion claim," to which the Court responded, "You net one out." Plaintiffs' counsel then explained, "And if the jury comes back and says it's never been more than 460. Your contract claim is 460. Your conversion claims is 460. Then, that's what we get, 460. We don't get it twice." (Rough Trial Trans., May 12, 2016, pp. 25-26). Accordingly, Plaintiffs conceded they may not recover more than $460,406 in compensatory damages.[3]

For the foregoing reasons, the Court GRANTS Defendants' Motion to Amend the Judgment.[4]

---

[3] Even if Plaintiffs did not waive a contrary argument, the jury verdict on these two claims, though inconsistent as to amount, awarded Plaintiffs a double recovery. Because both awards represent amounts owed under the APA, the $460,406 award for conversion necessarily encompasses the $256,500 award for breach of contract. Permitting Plaintiffs to recover the sum of the two awards would grant Plaintiffs a double recovery for the same wrong, constituting a clear error of law. See Clifford v. River Bend Plantation, Inc., 55 N.C. App. 514, 522 (1982) (concluding that trial court erred by allowing plaintiffs to recover twice for the same damages).

[4] By granting Defendants' Motion to Amend the Judgment, the Court need not address the arguments in Defendants' alternative Motion for a New Trial.

### D. Plaintiffs' Post-Trial Motions (Doc. No. 94)

Plaintiffs have submitted a (1) Renewed Motion for JMOL pursuant to Rule 50(b), (2) Motion for a Partial New Trial pursuant to Rule 59(a), and (3) Motion to Alter or Amend the Judgment pursuant to Rule 59(e).

#### 1. Renewed Motion for JMOL

Following the jury's verdict in phase one of the trial, the parties submitted briefs addressing whether the "in or affecting commerce" element of North Carolina's Unfair and Deceptive Trade Practices claim is a question of law or fact. (Doc. Nos. 78, 79). The Court entered an Order concluding that:

> North Carolina substantive law permits the Court to find that conduct was "in commerce" or "affected commerce" as a matter of law if sufficient facts are admitted or stipulated by the offending party. See Hardy v. Toler, 218 S.E.2d 342, 346-47 (N.C. 1975). Without the necessary admissions or stipulations, it is for the jury to find the facts upon which the Court bases its determination of whether the defendant engaged in unfair or deceptive trade practices. Id. Accordingly, it was appropriate to submit to the jury the issue of whether Defendants' acts were "in or affecting commerce." See Songwooyarn Trading Co., Ltd. v. Sox Eleven, Inc., 714 S.E.2d 162, 167 n.4 (N.C. App. 2011); Mapp v. Toyota World, Inc., 344 S.E.2d 297, 300 (N.C. App. 1986). The jury found that they were not. The jury's finding that Defendants' acts were not "in or affecting commerce" has a legally sufficient basis and is, therefore, a conclusion that a reasonable trier of fact could reach.

(Doc. No. 80). The Court, therefore, denied Plaintiffs' Rule 50(a) motion concerning that issue. Pursuant to Rule 50(b), Plaintiffs now renew their motion for JMOL as it relates to the "in or affecting commerce" element of their Chapter 75 claim and request that the Court find Defendants' conduct was in or affecting commerce as a matter of law. Plaintiffs present no compelling argument as to why this Court should overturn its past ruling or the jury's finding and, therefore, Plaintiffs' Renewed Motion for JMOL is DENIED.

#### 2. Motion for a Partial New Trial

Plaintiffs move for a partial new trial on the issue of damages for breach of contract,

arguing that the breach of contract award is inconsistent with the jury's calculation of the Call Price for the conversion claim. Plaintiffs contend that based on the conversion award, in which the jury calculated the Call Price as $1,499,999 (without the loan), the award of $256,500 for Cadrillion's breach of the APA for failure to pay the Call Price is against the clear weight of the evidence and inconsistent with the Court's jury instructions. In the alternative to a new trial, Plaintiffs move for additur of the damages award for breach of contract to the amount of $1,499,999.

As an initial matter, Plaintiffs failed to properly preserve this issue. At the start of the punitive damages phase of the trial, Plaintiffs moved the Court to re-submit the issue of damages for breach of contract to the jury contending that the $256,500 award for breach of contract was inconsistent with the jury's award of $1,499,999 for conversion of the Call Price. The Court stated that if it decided to resubmit the breach of contract issue to the jury, it would also resubmit the conversion issue. The Court then allowed Plaintiffs to reconsider whether they still wanted to pursue their motion. Upon reconsideration, Plaintiffs did not renew their motion. By failing to renew the motion at trial, Plaintiffs' waived the right to raise the issue here.[5] White v. Celotex Corp., 878 F.2d 144, 146 (4th Cir. 1989).

Regardless, contrary to Plaintiffs' argument, the jury could have reasonably calculated

---

[5] The Court had the following exchange with Plaintiffs' counsel:

> THE COURT: It appears to me that if it's an inconsistent verdict, you don't send back one side of the inconsistency; you send back both sides of the inconsistencies.
> MR. BURIC: All I asked to do is one. I only want to do one.
> THE COURT: My ruling is if I'm going to do it, I'm going to send both 1 and 1A back as well as 2 and 2D back.
> MR. BURIC: So we'll consider whether we want to renew that motion then.
> THE COURT: Right, you need to consider that.
> MR. BURIC: Yes, Your Honor, we'll consider that.
> THE COURT: If I'm going to do this, I'm not choosing one side of the inconsistency. That's up to the jurors to choose. So I'll let you think about it.

(Rough Trial Trans., Oct. 4, 2016, p. 14).

different amounts to award for each claim. Regarding the breach of contract claim, just because $256,500 is less than what Plaintiffs sought does not mean the amount is inconsistent with the evidence and this Court's instructions. The Court properly instructed the jury that "[a] person damaged by breach of contract is entitled to be placed, insofar as this can be done by money . . . in the same position he would have occupied if there had been no breach of the contract." (Rough Trial Trans., May 13, 2016, p. 29). The parties presented evidence at trial showing that when Cadrillion purchased LDA-GA's assets, it paid an initial purchase price of $513,000, representing two-thirds of the value of the assets purchased. The deferred payment, also known as the Deferred Purchase Price or the Call Price, represented the remaining one-third. In finding that Cadrillion breached the APA by not paying the Call Price, the jury could have reasonably determined that the remaining one-third value of the assets purchased was one-half of the initial two-thirds purchase price and that awarding this amount would place Plaintiffs "in the same position [it] would have occupied if there had been no breach of contract."

Regarding the conversion claim, a jury could have reasonably determined that by exercising the Call Option, Defendants vested in Plaintiff ownership rights of the Call Price and that, by not delivering the Call Price as required by the APA and instead depositing it with the Court, Defendants converted money that they knew belonged to Ms. Peters. The Court did not instruct the jury that the amount awarded for breach of contract and conversion must be the same, and Plaintiffs did not request such an instruction. In fact, during closing arguments, Plaintiffs' counsel even requested that the jury award different amounts for each claim. Any apparent inconsistency does not entitle Plaintiffs to a new trial. See Cox v. Collins, 7 F.3d 394, 396 (4th Cir. 1993) ("Jury verdicts must be upheld if a fair reading of special verdict form answers can be reasonably harmonized in view of the evidence." (citing Atlantic & Gulf Stevedores, Inc. v.

Ellerman Lines Ltd._, 369 U.S. 355 (1962) ("Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way."); _Ladnier v. Murray_, 769 F.2d 195 (4th Cir. 1985)).

Furthermore, as Defendants point out, Plaintiffs' argument is also barred by the invited error doctrine. Plaintiffs insisted that the jury be instructed on both the breach of contract and conversion claims relative to the Call Price. Thus, to the extent the jury was confused and rendered an inconsistent verdict, such inconsistency was invited by Plaintiffs. _See_ _Jones v. Southpeak Interactive Corp. of Delaware_, 777 F.3d 658, 674-75 (4th Cir. 2015) (denying new trial when jury returned an apparent inconsistent verdict but one that was consistent with the instructions where "the district court did not state that the jury must hold the defendants liable for equal sums").

Accordingly, Plaintiffs' Motion for a Partial New Trial and Alternative Motion for Additur are DENIED.

### 3. Motion to Alter or Amend the Judgment

Plaintiffs contend that the Court's failure to include findings on Ms. Peters's punitive damages award and to award pre- and post-judgment interest constitutes clear error and manifest injustice pursuant to Rule 59(e).

### i. Punitive Damages

Plaintiffs move this Court to amend the judgment to include findings upholding the jury's punitive damages award, arguing such findings are required by N.C. Gen. Stat. § 1D-50. Section 1D-50 provides that upon the Court's review of the evidence supporting a punitive damages award and the amount thereof, "the trial court shall state in a written opinion its reasons for upholding or disturbing the finding or award. In doing so, the court shall address with specificity the evidence, or lack thereof, as it bears on the liability for or the amount of punitive damages." North Carolina appellate courts have held, however, that trial courts are not required to issue a written opinion

regarding the award of punitive damages when the amount of punitive damages does not exceed the statutory limit. Babb v. Graham, 660 S.E.2d 626, 636 (N.C. App. 2008); Zubaidi v. Earl L. Pickett Enterprises, Inc., 595 S.E.2d 190, 196 (N.C. App. 2004) ("As the language of the statute does not require judicial review of a punitive damage award to be mandatory and we find no case law holding judicial review to be mandatory except in cases where the award exceeds the statutory limits, the trial court did not err in failing to make specific findings of fact . . . .").

Here, it is undisputed that the jury's award of $3 million in punitive damages did not initially exceed the allowable limit based on its award of $1,499,999 for conversion. See N.C. Gen. Stat. § 1D-25(b). Likewise, in reducing the conversion award to $460,406, the Court also reduced the punitive damages award to $1,381,218 so as not to exceed the statutory cap. Therefore, this Court is not required to enter a written opinion stating its reasons for upholding or disturbing the award. Nevertheless, as discussed in detail above with regard to Defendants' Renewed Motion for JMOL, there is a legally sufficient factual basis to support the jury's punitive damages award, and the award is not excessive. Plaintiffs' motion is therefore denied as to that issue.

### ii.   Pre- and Post-Judgment Interest

Plaintiffs next move this Court to amend the judgment to include an award of prejudgment interest on their awards for breach of contract and conversion. In North Carolina, an award of damages for breach of contract "bears interest from the date of the breach . . . at the legal rate," id. § 24-5(a), and an award of compensatory damages in a non-contract action "bears interest from the date the action is commenced until the judgment is satisfied." id. § 24-5(b). "Both North Carolina courts and the Fourth Circuit, in an unpublished opinion, have recognized that an award of prejudgment interest is mandatory." Bridgetree, Inc. v. Red F Mktg. LLC, No. 3:10-CV-00228-FDW, 2013 WL 443698, at *21 (W.D.N.C. Feb. 5, 2013); see also Castles Auto & Truck Serv., Inc. v. Exxon Corp., 16 F. App'x 163, 168 (4th Cir. 2001) (concluding that subsection 24-5(b) is

"unambiguously mandatory"); Hamby v. Williams, 676 S.E.2d 478, 481 (N.C. App. 2009) (same). Accordingly, Plaintiffs shall be awarded prejudgment interest at the statutory rate of eight percent[6] on its damages awards for breach of contract and conversion in accordance with subsections (a) and (b) of N.C. Gen. Stat. § 24-5.

Plaintiffs also request that the Court provide for post-judgment interest on Plaintiffs' compensatory damages, punitive damages, prejudgment interest, and attorneys' fees pursuant to 28 U.S.C. § 1961(a). "[F]ederal law mandates the awarding of post-judgment interest." Quesinberry v. Life Ins. Co. of N. Am., 987 F.2d 1017, 1031 (4th Cir. 1993). Therefore, the Court awards Plaintiffs post-judgment interest pursuant to 28 U.S.C. § 1961 for the total damages award.

Plaintiffs shall submit a supplemental brief solely limited to providing the amount of prejudgment interest due under N.C. Gen. Stat. § 24-5(a) and (b) and the amount of post-judgment interest due under 28 U.S.C. § 1961. The supplemental brief shall be filed within seven (7) days of the entry of this Order and shall not exceed 750 words. Defendants will have seven (7) days to file a Response to Plaintiffs' supplemental brief not to exceed 750 words.

### E. Plaintiffs' Motion for Attorneys' Fees (Doc. No. 87)

Pursuant to N.C. Gen. Stat. § 6-21.6 and the APA's reciprocal attorneys' fees provision, Plaintiffs request attorneys' fees in the amount of $1,585,499.67 based on Plaintiffs' one-third contingent fee agreement, or alternatively, $743,297 based on the actual hours spent by Plaintiffs' counsel.[7] Defendants argue that the attorneys' fees provision is unenforceable and that the fees

---

[6] See N.C. Gen. Stat. § 24-1 ("The legal rate of interest shall be eight percent (8%) per annum for such time as interest may accrue, and no more.").

[7] Based on the Court's reduction of Plaintiffs' award for conversion and punitive damages, the amount of Plaintiffs' one-third contingency fee is now less than the fee based on total hours spent by counsel.

requested are unreasonable. For the following reasons, the Court awards Plaintiffs attorneys' fees in the amount of $743,297 against Cadrillion.

### 1. Enforceability of the APA's Reciprocal Attorneys' Fees Provision

Under N.C. Gen. Stat. § 6-21.6(c), "[i]f a business contract . . . contains a reciprocal attorneys' fees provision, the court . . . may award reasonable attorneys' fees in accordance with the terms of the business contract." The parties do not dispute that the APA is a "business contract" or that it contains a reciprocal attorneys' fees provision. That provision entitles the prevailing party to recover reasonable attorneys' fees in "any action, suit or arbitration proceeding arising out of or relating to this Agreement or any breach or alleged breach thereof." (Doc. No. 17-2, p. 26, ¶11.6).

Relying on Liberty Mut. Fire Ins. Co. v. KB Home, No. 5:13-CV-831-BR, 2015 WL 4877835 (E.D.N.C. Aug. 14, 2015), Defendants argue that the APA's fee provision is wholly unenforceable because it is located within a section of the APA related to enforcement of the non-compete and confidentiality provisions, rather than the section related to "Expenses." In KB Home, the plaintiffs were not entitled to attorneys' fees because the contract's fee provision was expressly limited to disputes submitted to arbitration. Id. at *3. In contrast, the fee provision here applies to "any action, suit or arbitration proceeding arising out of or relating to [the APA] or any breach or alleged breach thereof." Based on its plain language, the fee provision is not limited to arbitration or, as Defendants argue, matters related to enforcement of the non-compete and confidentiality provisions only. Considering the core facts of this action clearly arise out of Cadrillion's breach of the APA, this suit is included within the scope of the fee provision, regardless of its location within the APA. However, the Court agrees with Defendants' contention that the fee provision is unenforceable against LDA-NC and Mr. Yuhas because they are not parties to the APA. Only parties to the APA are bound by the contract's attorneys' fees provision.

Accordingly, because the APA's reciprocal attorneys' fees provision is enforceable against Cadrillion, Plaintiffs are entitled to reasonable attorneys' fees within the Court's discretion. N.C. Gen. Stat. § 6-21.6(c).

### 2. Reasonableness of Attorneys' Fees

Defendants argue that Plaintiffs' requested fee is unreasonable in amount, that Plaintiffs failed to present sufficient evidence regarding the reasonableness of the hourly rates and fees requested, and that Plaintiffs may not recover fees related to unsuccessful claims or non-contract claims.

N.C. Gen. Stat. § 6-21.6(c) provides that "[i]n determining reasonable attorneys' fees and expenses under this section, the court . . . may consider all relevant facts and circumstances, including, but not limited to," thirteen enumerated factors. After considering all relevant facts and circumstances, the Court concludes that $743,297 is a reasonable fee based on the actual hours spent by Plaintiffs' counsel. Plaintiffs prevailed on two out of four causes of action as well as their claim for punitive damages, resulting in an initial jury award of over $4.75 million; though the Court has reduced the award, Plaintiffs still obtained an extremely favorable result. Id. § 6-21.6(c)(1), (11). The novelty and difficulty of the questions raised in the action also weigh in Plaintiffs' favor considering the case involved complex issues of contract interpretation and damage calculation; a high degree of skill was required to present Plaintiffs' case through to trial. Id. § 6-21.6(c)(3), (4). Moreover, the relative economic circumstances of the parties favor Plaintiffs, considering Plaintiffs lacked resources to hire counsel on an hourly basis and the evidence at trial established the parties' disparate economic circumstances. Id. § 6-21.6(c)(5). Evidence also showed that Cadrillion unjustly exercised its superior economic bargaining power by, *inter alia*, refusing to pay any portion of the Call Price unless Plaintiffs agreed to extra conditions not required under the APA. Id. § 6-21.6(c)(8). Also, the terms of the APA provide

that the prevailing party "shall" be entitled to recover reasonable attorneys' fees.  Id. § 6-21.6(c)(13).

In addition, and perhaps most importantly, the Court has carefully reviewed the billing records submitted and finds the hours billed by the law firm representing Plaintiffs to be reasonable, particularly in light of the complex nature of this litigation, its length, including a two-week jury trial, and the attorneys' skill and experience.  Id. § 6-21.6(c)(3), (4).[8]  Plaintiffs' counsel billed approximately 2,145.7 hours from April 13, 2015, to October 17, 2016.  The Court finds this amount to be reasonable and further finds that counsel's billing entries adequately describe the work performed on behalf of the clients.  These entries provide sufficient information for the Court to review the tasks performed, without delving into unnecessary detail that could possibly expose information protected under the attorney client privilege and/or work product doctrine.

Though Plaintiffs take issue with fees related to ten different attorneys, many of whom did not make an appearance in this case, the Court finds it is not unusual for multiple attorneys at a large law firm to work on a complex case.  The amount billed here reasonably ranges from $130 to $450 per hour depending on skill level and experience.  Moreover, Plaintiffs' counsel is not seeking to recover over $20,000 in fees incurred in defending Plaintiffs in the lawsuit filed by Cadrillion in which Cadrillion sought to deposit money with this Court.

---

[8] The fact that Plaintiffs' contingency fee is less than an award based on time spent does not mean that the higher amount is unreasonable.  See Blanchard v. Bergeron, 489 U.S. 87, 93 (1989) ("[A] contingent-fee contract does not impose an automatic ceiling on an award of attorney's fees.").

Moreover, contrary to Defendants' argument, the North Carolina Court of Appeals has determined that an attorneys' time sheets and an affidavit from the attorney detailing the billable hours is adequate to support a trial court's finding that the time spent by counsel and his rate were reasonable.  See, e.g., Stilwell v. Gust, 148 N.C. App. 128, 132 (2001).

Both parties agree that the analysis under N.C. Gen. Stat. § 6-21.6 and the federal lodestar analysis are substantially the same.  Under the lodestar method, the Court multiplies the number of reasonable hours expended by a reasonable hourly rate.  Irwin Indus. Tool Co. v. Worthington Cylinders Wisconsin, LLC, 747 F. Supp. 2d 568, 591 (W.D.N.C. 2010) (citing Robinson v. Equifax Info. Services, 560 F.3d 235, 243 (4th Cir. 2009).  That method, therefore, is appropriate here.

In addition, contrary to Defendants' arguments, the Court should not reduce Plaintiffs' attorneys' fee award simply because Plaintiffs did not prevail on every claim. As previously explained at length, all claims in this case were based on the same intertwined nucleus of operative facts. Therefore, it is reasonable that most of the attorneys' time was directed at all claims, as opposed to on a claim-by-claim basis. See Whiteside Estates, Inc., v. Highlands Cove, L.L.C., 553 S.E.2d 449, 443 (N.C. App. 2001) ("[R]easonableness, not arbitrary classification of attorney activity, is the key factor . . . ."). Because all of Plaintiffs' claims arose out of the same set of facts and related legal theories, all of the work of Plaintiffs' attorneys related to the litigation as a whole. See id. ("[W]here all of plaintiff's claims arise from the same nucleus of operative facts and each claim was inextricably interwoven with the other claims, apportionment of fees is unnecessary." (quotation marks and citation omitted)).

Finally, Defendants' argument that Plaintiffs may not recover fees unrelated to enforcing the APA is unavailing. Although the APA provides the only basis for a fee award, the express language of the APA authorizes recovery of fees "arising out of or relating to this Agreement or any breach or alleged breach thereof." Plaintiffs' non-contract claims against Cadrillion clearly relate to the APA and Cadrillion's breach thereof. Accordingly, given the broad scope of the fee provision, Defendants' argument that Plaintiffs may not recover fees for those claims defies common sense. Okwara v. Dillard Dep't Stores, Inc., 525 S.E.2d 481, 487 (N.C. App. 2000) ("[D]efendants may be awarded fees for any portion of the defense stemming from the same nucleus of fact.").

Accordingly, based on the Court's consideration of the factors enumerated in N.C. Gen. Stat. § 6-21.6(c) and all other relevant facts and circumstances, the Court GRANTS Plaintiffs' Motion and awards Plaintiffs attorneys' fees in the amount of $743,297 against Cadrillion.

### III. CONCLUSION

IT IS THEREFORE ORDERED that for the reasons explained above:

1. Defendants' Renewed Motion for Judgment as a Matter of Law (Doc. No. 90) is DENIED.

2. Defendants' Motion to Amend the Judgment (Doc. No. 92) is GRANTED. The Court amends the judgment as follows:

   a. The conversion award is reduced to $460,406;

   b. The punitive damages award is reduced to $1,381,218 ($920,812 against Cadrillion and $460,406 against Mr. Yuhas);

   c. To eliminate double recovery, Plaintiffs may not recover more than $460,406 in compensatory damages.

3. Plaintiffs' Post-Trial Motions (Doc. No. 94):

   a. Plaintiffs' Renewed Motion for Judgment as a Matter of Law is DENIED;

   b. Plaintiffs' Motion for a Partial New Trial is DENIED;

   c. Plaintiffs' Motion to Alter or Amend the Judgment is GRANTED IN PART and DENIED IN PART. It is DENIED as to punitive damages and GRANTED as to Plaintiffs' request for pre- and post-judgment interest. Plaintiffs are ORDERED to submit a supplemental brief within seven (7) days of entry of this Order providing the amount of pre- and post-judgment interest due. Defendants will have seven (7) days to file a Response. The parties' briefs shall not exceed 750 words.

4. Plaintiffs' Motion for Attorneys' Fees (Doc. No. 87) is GRANTED. The Court awards Plaintiffs $743,297 against Cadrillion.

   IT IS SO ORDERED.

Signed: January 19, 2017

Frank D. Whitney
Chief United States District Judge